## BURROUGHS CORPORATION

v.

## The UNITED STATES.

### No. 272–79C.

United States Court of Claims.

Aug. 13, 1980.

William H. Buttefield, Washington, D.C., attorney of record, for plaintiff; Joel P. Shedd, Sellers, Conner & Cuneo, Washington, D.C., and Richard G. Porter, of counsel.

Stephen G. Anderson, Washington, D.C., with whom was Asst. Atty. Gen., Alice Daniel, Washington, D.C., for defendant; J. William Eshelman, United States Postal Service, Washington, D.C., of counsel.

Before DAVIS, KASHIWA and BENNETT, Judges.

## PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT AND DEFENDANT'S CROSS–MOTION FOR SUMMARY JUDGMENT

BENNETT, Judge:

This case comes before the court for review of a decision of the Postal Service

Board of Contract Appeals (PSBCA) under the provisions of the Wunderlich Act, 41 U.S.C. §§ 321, 322 (1976). The parties have filed cross–motions for summary judgment. We have concluded that the PSBCA's decision against plaintiff was based on an erroneous interpretation of the contract and is therefore without finality. We reverse the decision and remand the case.

Under the contract in dispute, plaintiff was required to produce, deliver, and install 113 hardware systems combining a Multi–Position Letter Sorting Machine (MPLSM), a Zip Mail Translator (ZMT), and an Electronic Sort Processor (ESP). Prior to the contract, only experimental models of the ESP had ever been produced. Earlier systems then in use by the Postal Service had included MPLSM and ZMT units, but these units required modifications in order to function in combination with an ESP.

The negotiated contract price was subject to incentive price increases and penalty price decreases based on whether a system was completed early or late. The original contract schedule called for deliveries as follows:

| Line Item | Identification | Time of Delivery |
| --- | --- | --- |
| IV | Drawings and specifications (also called the technical data package or TDP) | |
| | Interim baseline drawings | Nov. 1975 |
| | Final drawings | Mar. 1976 |
| V | Operation and maintenance (O&M) manuals | |
| | Preliminary ESP | Nov. 1975 |
| | Preliminary LSM | Mar. 1976 |
| | Revised ZMT | Mar. 1976 |
| VI | Maintenance training | Jan. 1976 |
| I | Hardware | |
| | First articles | Mar. 1976 |
| | Initial shipment | May 1976 |

The contracting officer later determined that no training would be needed on the MPLSM or ZMT units. On October 24, 1975, Modification 18 to the contract was executed to delete such training and to reduce the contract price. It was originally

intended that the O & M manuals for the ESP would be a part of the materials provided to the Postal Service personnel to be trained by plaintiff. When it became apparent that the ESP O & M manuals would not be available in time, the contracting officer decided to purchase "interim" materials consisting of schematic drawings of the ESP cabinet. The training classes were conducted in January 1976, as scheduled, and the Postal Service made no contemporaneous objections to the quality of the instruction or materials provided.

During early 1976 it became apparent that plaintiff would not be able to meet the original delivery schedule in other respects, and new schedules were proposed by plaintiff which provided for the delivery of the TDP and the O & M manuals after the delivery and installation of the hardware but before its acceptance.[1] By letter dated April 29, 1976, plaintiff was advised for the first time that any revised schedules "should reflect the contractually required delivery sequence," which in the opinion of the contracting officer was "(1) Delivery of an acceptable First Article; (2) Delivery of Drawings and Specifications which are authenticated with that acceptable First Article; (3) Delivery of Preliminary 'O & M' manuals; and (4) Delivery of Production Hardware after the delivery of the foregoing first three deliverables."

In the Postal Service's view this delivery sequence was necessary to assure that hardware delivered to and installed in the field could be properly maintained. As one internal memorandum stated:

> If Burroughs was [sic] allowed to ship the hardware on the contract date of May 10, 1976, and not achieve their scheduled dates for the completion of the maintenance documentation, the Postal Service would be in a position of having equipment in the field and not being able to maintain it, due to the lack of maintenance documentation. The Postal Ser-

---

1. Hardware would be accepted after a contractually set "installation span" of 3 or 4 months, depending on the particular system. Acceptance was the last step necessary for comple-

tion, and so the date of acceptance controlled the amount of incentive or penalty price adjustments.

vice cannot allow this situation to exist or even be put into a position where it may happen.

Plaintiff requested permission by a letter dated May 26, 1976, to begin hardware deliveries on June 7, 1976. Plaintiff proposed to deliver the O & M manuals on July 12, 1976, and the TDP in parts on June 21 and July 20, 1976. Plaintiff added:

Burroughs assures the USPS that the preliminary manuals will be on site prior to final acceptance of the first systems. As further assurance, if for some unknown reason, the manuals are not available, Burroughs will entertain leaving an experienced field engineer at the site location to assist USPS in maintenance until the manuals arrive. Or, the USPS may elect not to accept the system until manuals are available. The choice would be up to the Postal Service.

By a letter dated June 9, 1976, the contracting officer denied the proposed schedule because of the "altered sequence of delivery." Plaintiff requested reconsideration of this decision and again stated:

* * * In the unlikely event the manuals are not on site by the system operational dates, Burroughs will leave an experienced field engineer at each site location to assist USPS in maintenance until the manuals arrive. Or the USPS may elect not to accept the hardware.

The request for reconsideration was denied. The contracting officer later advised plaintiff by a letter dated July 23, 1976, that the manuals had been received and that plaintiff was authorized to offload hardware systems beginning July 26, 1976.

Plaintiff had to suffer penalties under the contract because of the Postal Service's refusal to permit plaintiff to begin hardware deliveries for a period of 49 days. Plaintiff argues that this refusal was improper because the contract did not require the delivery sequence demanded by the Postal Service, or, alternatively, that any contractually required delivery sequence was waived or changed by the Postal Service.

The PSBCA, with one administrative judge dissenting, concluded that the contract prescribed a delivery sequence which required O & M manuals and training materials to be delivered prior to the delivery of the hardware. The PSBCA did find that the delivery sequence of some software, such as certain training materials and the O & M manual for the ZMT, was rearranged by contract modifications to permit their delivery after the date of delivery for the hardware. However, the PSBCA apparently believed that the software not covered by the contract modifications was essential to the Postal Service for maintenance purposes and that, therefore, the Postal Service could insist on its delivery prior to the delivery of the hardware and did not waive its rights to so insist.

Uniform Commercial Code § 2–612(3) reflects the general rule of contract law with respect to installment contracts which require or authorize the delivery of goods in separate lots. It provides:

(3) Whenever non–conformity or default with respect to one or more installments substantially impairs the value of the whole contract there is a breach of the whole. * * *

The Uniform Commercial Code does not define what constitutes substantial impairment, but the prior Uniform Sales Act § 45(2) is somewhat more specific in this regard, providing that:

(2) Where there is a contract to sell goods to be delivered by stated installments, which are to be separately paid for, and the seller makes defective deliveries in respect of one or more installments, * * * it depends in each case on the terms of the contract and the circumstances of the case, whether the breach of contract is so material as to justify the injured party in refusing to proceed further and suing for damages for breach of the entire contract, or whether the breach is severable, giving rise to a claim for compensation, but not a right to treat the whole contract as broken.

Thus, the question in the present case is whether a failure to deliver the TDP and

the O & M manuals before the hardware was delivered and installed would have constituted a substantial impairment or material breach of the whole contract. If so, the Postal Service was justified in suspending its obligation under the contract to receive delivery of the hardware and in insisting that any revised delivery schedule provide for the delivery of software before hardware. If not, the Postal Service could not treat the whole contract as broken and should have continued to perform its obligations under the contract, reserving any claims for actual damages for later settlement.

Defendant relies on several clauses in the RFP and the contract to establish that the breach was material. The RFP clause concerning time of delivery provides:[2]

> * * * If the offeror proposes his own schedule, it *must sequencially [sic] offer the same delivery pattern* as that contained in this RFP. (Hardware cannot be accepted before drawings, manuals, and trained maintenance people are available.) [Emphasis in original.]

The contract provision relating to early shipments[3] states:

> If a system is to be shipped, installed and accepted more than 30 days in advance of the contracted completion schedule, notification of early shipment, stating the time of delivery must be sent to the Contracting Officer in writing 120 days prior to factory shipping date. If units are to be shipped in advance of the contracted schedule, all other deliverable items (trainers, drawings, manuals, etc.) must be shipped in the same advanced rate.

Finally, Work Statement 102 which was incorporated into the contract provided with respect to O & M manuals: "In order to support early training requirements as well as to provide maintenance documentation with initial hardware shipments, the Contractor shall develop and deliver preliminary manuals in lieu of a review manuscript * * *."

■ Taken together, these clauses establish that the sequence of deliveries was *in general* a material consideration to the contract. Thus, plaintiff was not free to make major changes in the delivery sequence. The *particular* changes that would be considered to be major were left largely unspecified by the contract. Fortunately, one clause, the RFP clause quoted above, does address the problem of a particular variation in sequence by providing that manuals and drawings must be available before hardware can be accepted. Both acceptance and delivery are defined terms with specific meanings, and it must be assumed that the Postal Service was aware of the difference when it drafted this language. By establishing that the acceptance of hardware before the delivery of drawings and manuals would be an intolerable change in sequence, the Postal Service in drafting the contract implicitly excused, as a minor variation in sequence, the delivery of hardware before the delivery of drawings and manuals. Additionally, under the actual circumstances of the case, as discussed below, the inconvenience to the Postal Service through plaintiff's proposed change in sequence would have been in fact minor.

Defendant alternatively argues that plaintiff's deliveries although later than the original schedule, may be governed by the early shipments clause since plaintiff has a separate claim pending before the PSBCA for 220 days of excusable delay. Therefore, defendant urges the court to wait for the resolution of this claim. The early shipments clause by its terms clearly applies only to shipment in advance of the "contracted completion schedule" and, therefore, does not apply to the shipments in this case regardless of any periods of excusable de-

---

**2.** This clause in the RFP was incorporated by reference in the contract. Both parties rely on the clause and treat it as indicative of the proper interpretation of the contract.

**3.** The contract clause concerning late shipments contains no mention of any sequential requirement. The PSBCA, having erroneously decided that there was a delivery sequence established elsewhere in the contract, concluded that the "late shipments" clause did not modify this sequence.

lay. This is because, as noted above, there was no contract provision requiring any sequence of shipment in connection with late shipments such as involved in this case.

■ In judging the materiality of the delivery sequence, both parties lay almost exclusive stress on the terms of the contract and neglect the actual circumstances of the case. There was some dispute before the PSBCA as to the adequacy of the training conducted by plaintiff without benefit of the O & M manuals. The PSBCA cited testimony that some of the Postal Service personnel attending this training had to undergo retraining after the ESP O & M manuals were received in July 1976. This testimony was hearsay and so vague and uncertain as to lack sufficient assurance of its truthfulness. As such it does not constitute substantial evidence. *McKee v. United States*, 205 Ct.Cl. 303, 310, 500 F.2d 525, 528 (1974); *Reil v. United States*, 197 Ct.Cl. 542, 456 F.2d 777 (1972). Plaintiff was paid in full for the training at the time with no exceptions taken. The alleged deficiency in the training appears to have been an after–thought once litigation arose. Moreover, even if the training was in fact deficient, this can provide no logical justification for delaying delivery of the hardware since the training was already completed.

The Postal Service's contemporaneous justification for its insistence on the delivery sequence was that it could not risk having hardware installed in field post offices which could not be maintained after acceptance. Defendant argues that the only way to be certain of avoiding this risk was to insist on delivery of the manuals before delivery and installation of the hardware. Based on the evidence in the record, we cannot disturb the board's factual finding that the manuals were necessary for the proper maintenance of the hardware by Postal Service personnel. However, plaintiff assured the Postal Service that the manuals would be delivered before acceptance when the Postal Service assumed the responsibility for maintenance, and plaintiff in fact delivered the manuals before its proposed date of acceptance. Moreover, in

the event that the manuals were delayed, plaintiff promised to leave an experienced field engineer at each site location to assist the Postal Service in maintenance. The Postal Service did not then and does not now provide any explanation as to why this proposal was not adequate protection against any risks.

■ Defendant, alternatively, argues that the contracting officer could properly have terminated plaintiff for default after it failed to meet the original schedule for the delivery of the manuals and the TDP. Even if this were true, it does not provide any basis for the contracting officer's actions here. It is well established that if the contracting officer does not decide to terminate a contractor for default within a reasonable time, any new delivery schedule unilaterally set by the contracting officer must be reasonable. *International Telephone & Telegraph Corp. v. United States*, 206 Ct.Cl. 37, 509 F.2d 541 (1975); *DeVito v. United States*, 188 Ct.Cl. 979, 413 F.2d 1147 (1969). Just as the contracting officer cannot set an unreasonably short delivery date to insure a further default, he cannot set an unreasonable delivery sequence to increase the penalties incurred by the contractor. Having stressed the importance of time by putting incentive and penalty price adjustments in the contract, the Postal Service had a duty to cooperate and take all reasonable actions to permit completion on time or with as little delay as possible. As indicated above, defendant has failed to show that the Postal Service's actions were reasonable in view of plaintiff's assurances and promise to provide engineers for maintenance, if necessary.

Accordingly, upon consideration of the pleadings, motions, briefs, pertinent parts of the administrative record, and the board's opinion, without oral argument, plaintiff's motion for summary judgment is granted, and defendant's cross–motion for summary judgment is denied. The case is remanded to the Postal Service Board of Contract Appeals for further proceedings to determine the amount of the contract price adjustment, consistent with this opinion.

All proceedings relating to this case in this court are stayed pending completion of the administrative proceedings, for a period not to exceed 6 months. The attorney of record for plaintiff is designated to advise the court, by letter to the trial judge (with a copy to opposing counsel) of the status of the administrative proceeding, such advice to be given at intervals of 90 days or less, beginning with the date of this decision.